Filed 12/10/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MANUCHEHR RAHBARI,<br><br>        Defendant and Appellant. | A139464<br><br>(San Mateo County<br>Super. Ct. No. SC077313A) |

Appellant Manuchehr Rahbari was convicted of passing checks with insufficient funds. He was sentenced, pursuant to Penal Code section 1170, subdivision (h) (section 1170(h)),[1] to a term in county jail followed by mandatory supervision. The trial court also ordered appellant to pay restitution to certain victims. In the published portion of our opinion, we conclude that the scope of a victim restitution order issued in connection with a sentence pursuant to section 1170(h) is limited to those losses caused by the crime or crimes of which the defendant was convicted. In the unpublished portion of our opinion, we address the remainder of appellant's claims.

BACKGROUND

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I–III, IV(A), IV(B)(1), IV(B)(3)–(4) and IV(C).

[1] All undesignated section references are to the Penal Code.

1

In March 1985, appellant was charged by complaint with 26 counts of passing checks with insufficient funds (§ 476a, subd. (a))[2] and one count of grand theft (§ 487). Appellant was not arrested on these charges until 2012.

At a June 2013 bench trial, the evidence was as follows. In 1980 or 1981, appellant and Andy Saberi jointly owned gasoline stations. For one of their stations, appellant and Saberi held a joint bank account at Security Pacific National Bank (the SPNB account). Appellant was responsible for the day to day management of this station and had access to the SPNB account checkbook approximately 99 percent of the time. The average balance in the SPNB account was $20,000-$30,000.

For two of appellant and Saberi's other stations, Roger Allen held a nominal one percent interest. Because the gasoline supplier would only accept payments from Allen in connection with these stations, appellant and Allen held a joint business account at Bank of America (the BOA account). Allen signed checks to the supplier but otherwise had no involvement in the stations or with the BOA account.

In March 1984, 26 checks from the SPNB account—dated on four consecutive days, signed by appellant, and made out to "cash"—were deposited into the BOA account. The checks totaled approximately $235,000. No single check exceeded $10,000; at the time, banks were required to report checks over $10,000 to the government. Appellant admitted the endorsement signatures on the back of the checks "look[] like mine" but denied endorsing the checks.

John Roth, a Bank of America investigator in the 1980s who was familiar with Bank of America's business practices at that time, testified that when a check was

---

[2] Section 476a, subdivision (a), provides, "Any person who . . . willfully, with intent to defraud, makes or draws or utters or delivers a check, draft, or order upon a bank or depositary, a person, a firm, or a corporation, for the payment of money, knowing at the time of that making, drawing, uttering, or delivering that the maker or drawer or the corporation has not sufficient funds in, or credit with the bank or depositary, person, firm, or corporation, for the payment of that check, draft, or order and all other checks, drafts, or orders upon funds then outstanding, in full upon its presentation," is guilty of a criminal offense.

deposited into a Bank of America account, Bank of America sent the check to the drawee bank. While the check was being processed by the drawee bank, Bank of America might credit the account in the amount of the check, depending on the customer's creditworthiness. If the drawee bank returned the check to Bank of America instead of paying it, Bank of America debited any amount credited to the Bank of America account and sent the account holder a form notice, called a return item advice letter.

Roth reviewed the various stamps and markings on the 26 checks from the SPNB account and associated return item advice letters. Based on this review, he confirmed that Bank of America had sent these checks to Security Pacific National Bank and subsequently received the returned checks stamped with the notation "NSF S.P.N.B." Roth testified that NSF stood for non-sufficient funds. Subsequently, Saberi and Allen were contacted by their respective banks regarding insufficient checks and both attempted, unsuccessfully, to locate appellant. Neither Saberi nor Allen saw or heard from appellant again until after his arrest. Saberi and Allen were held liable for overdrafts on the SPNB account and BOA account, respectively.

An expert in check-kiting testified this conduct was consistent with "a classic case of basic check-kiting," whereby "a person having two checking accounts for two separate banks, tak[es] checks from one bank knowing there's non-sufficient funds to back those checks, deposit[s] them into their other banking account over a . . . very short period of time, several days, high-dollar amount checks, then make[s] cash withdrawals based off those deposits before the bank catches on."

Appellant testified in his own defense that he was the sole owner of the station linked to the SPNB account and the sole owner of the BOA account. Appellant also testified that in January 1984, he went to Iran to be with his sick mother. Although he intended to spend only 15 days in Iran, he was prevented from returning until 1986 because he did not have a passport. Prior to his departure, he asked a friend, Manu Hashemi, to manage the stations in his absence. He made out the SPNB account checks to "cash," post-dated them for March even though he expected to be back by then, and left them with Hashemi to cover gasoline deliveries.

3

The trial court acquitted appellant on the grand theft charge but found him guilty of the 26 counts of passing checks with insufficient funds. He was sentenced pursuant to section 1170(h) to a term of one year in county jail followed by three years mandatory supervision.

DISCUSSION

I. *Business Records Exception*

Appellant challenges the trial court's admission of the 26 checks and the corresponding return item advice letters under the business records exception to the hearsay rule. We affirm the trial court's ruling.[3]

"Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (Evid. Code, § 1271.) "A trial court has broad discretion in determining whether a sufficient foundation has been laid to qualify evidence as a business record. On appeal, we will reverse a trial court's ruling on such a foundational question only if the court clearly abused its discretion." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1011.)

Appellant argues Roth, a Bank of America employee, could not lay the necessary foundation to establish the "NSF S.P.N.B." notation on the checks, created by a Security Pacific National Bank employee, "indicat[ed] that these checks were received and thereafter rejected due to insufficient funds." We need not decide whether Roth could have laid such a foundation, for example, by testifying to his knowledge of a standard practice in the banking industry that, when a check was received from another bank for

---

[3] The parties dispute whether appellant forfeited this claim with respect to the checks by failing to sufficiently object below. Because we reject appellant's claim on the merits, we need not decide this issue.

4

payment, employees reviewed the account balance and, if the account contained insufficient funds, stamped the check with a notation indicating this status. Roth did not provide any such testimony. Accordingly, we agree with appellant only to the extent that the "NSF S.P.N.B." notation was not admissible as direct evidence that appellant lacked sufficient funds in the SPNB account. This finding does not preclude admission of the documents because they were admissible for other purposes, for example, to show appellant deposited the checks from his SPNB account into his BOA account and Bank of America did not receive payment from Security Pacific National Bank on the checks. It is not apparent from the record whether the trial court erroneously considered the records as direct evidence of insufficient funds in the SPNB account. In the absence of evidence to the contrary, "we presume . . . that the court knows and applies the correct statutory and case law [citation] and is able to distinguish admissible from inadmissible evidence, relevant from irrelevant facts, and to recognize those facts which properly may be considered in the judicial decisionmaking process." (*People v. Coddington* (2000) 23 Cal.4th 529, 644, overruled on another ground by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) In any event, any error would be harmless as there was ample other evidence of insufficient funds: Allen's testimony that he was held liable for overdrafts on the BOA account for approximately the same amount as appellant's checks; Saberi's testimony the SPNB account generally held only $20,000 to $30,000 and that he was held liable for overdrafts on that account; the evidence appellant disappeared shortly after depositing the checks; and the fact that Bank of America did not receive payment from Security Pacific National Bank on the checks. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1121-1122 [erroneous admission of hearsay evidence harmless where "it is not reasonably probable that the perceived error affected the verdict"].)[4]

---

[4] Appellant contends any improper admission of hearsay evidence deprived him of his right to confrontation under the Sixth Amendment of the United States Constitution and therefore should be reviewed for harmlessness under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18. We disagree. "Business and public records . . . [that] hav[e] been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial . . . are not testimonial," and therefore not

Appellant also argues Roth did not and could not testify "that these records were actually maintained by Bank of America, that they were authentic, or that Bank of America was even their source." Roth testified, based on his knowledge of Bank of America's practices and the stamps on the back of the checks, that the checks had been deposited in a Bank of America account. He also testified to his familiarity with Bank of America's form return item advice letters and their processing and confirmed that the return item advice letters in evidence appeared to be copies of original such letters generated by a Bank of America employee. A foundational witness "need not have been present at every transaction to establish the business records exception; he or she need only be familiar with the procedures followed." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 322 (*Jazayeri*).) The trial court's admission of the records based on this testimony was not an abuse of discretion.

Appellant complains Roth did not explain the "mode of preparation" of the notations on the back of the checks, but does not explain what was insufficient about Roth's testimony. Roth testified he was familiar with how checks deposited at Bank of America were processed; in the course of such processing, Bank of America and the drawee bank made stamps and/or indications on the checks; and he was familiar with what some of those stamps meant. Appellant has not explained what further testimony was necessary to establish the foundation and has therefore failed to show error in the trial court's ruling. *People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1313, cited by appellant, is inapposite: in that case, a law enforcement officer attempted to lay the foundation for admission of a retail store sales receipt, rather than an employee of the business itself.

Appellant argues the return item advice letters are not a business record but instead a notification sent to the bank customer. He cites no authority for the proposition that a writing cannot be both a business record and a notification to a customer. Such

_____

subject to the confrontation clause. (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 324.)

6

writings that are created in the ordinary course of business and satisfy the other criteria set forth in Evidence Code section 1271—as the return item advice letters did—qualify for the hearsay exception.

Finally, appellant noted Roth did not identify the name or title of the individual who prepared the notices. Roth testified the notices were prepared by Bank of America employees as part of their regular job duties, at or near the time Bank of America is notified a check has been returned for insufficient funds. This is sufficient; it is not necessary for the foundational witness to identify the name or title of the preparing employee. (See *Jazayeri, supra,* 174 Cal.App.4th at p. 322.)

II. *Motion for Judgment of Acquittal*

Appellant argues his trial counsel was ineffective for failing to move for judgment of acquittal (§ 1118) at the close of the People's case, before appellant testified.

We need not decide whether counsel's performance was deficient because appellant has failed to demonstrate prejudice. " ' "Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*In re Thomas* (2006) 37 Cal.4th 1249, 1256 (*Thomas*).) Appellant was acquitted of grand theft and therefore not prejudiced with respect to this charge. With respect to the remaining counts, appellant argues there was insufficient evidence of his intent to defraud Bank of America at the close of the prosecution's case, and his testimony may have supplemented that evidence. We disagree. The evidence, presented in the prosecution's case in chief, of the multiple checks made out to "cash," the insufficient funds in the SPNB account, and appellant's flight was sufficient evidence of his intent to defraud. We do not find it reasonably probable that a motion to acquit made at the close of the People's case would have been successful on the section 476a, subdivision (a), counts.

III. *Speedy Trial*

7

Appellant contends the trial court erred in denying his motion to dismiss alleging a violation of his right to a speedy trial under the California Constitution.[5] We affirm the trial court's ruling.

In a speedy trial motion under the state Constitution, "[t]he defense has the initial burden of showing prejudice from a delay in bringing the defendant to trial. Once the defense satisfies this burden, the prosecution must show justification for the delay. If the prosecution does that, the trial court must balance the prejudice to the defendant resulting from the delay against the prosecution's justification for the delay." (*People v. Lowe* (2007) 40 Cal.4th 937, 942.) To establish prejudice, a defendant "must show that the delay has impaired the ability to defend against the charged crime because, for instance, a witness has become unavailable, evidence has disappeared, or the memory of a potential witness has faded." (*Id.* at p. 946.) We review the trial court's ruling for substantial evidence. (*People v. Garcia* (2014) 223 Cal.App.4th 1173, 1177.)

As an initial matter, the parties dispute the factual record established for purposes of appellant's speedy trial motion. We need not decide this issue because, even assuming the parties stipulated to the truth of the facts as presented in appellant's motion, appellant still failed to meet his burden of demonstrating prejudice from the delay.

Appellant's motion argued: "the people [appellant] could contact to attest to his banking relationships, that his checks would have been honored, etc. are gone. Their place of employment, Security Pacific National Bank, has twice merged into other entities. . . . [Appellant] would be unable to establish what liberties might have been available to him, whether the individuals in the bank would have covered which checks, etc. Moreover, [appellant] turned over signed checks as well as management of his gasoline stations to another; that individual is now deceased. What his instructions were and whatever he might have done to exceed those instructions can no longer be proven." At the hearing, when the prosecutor complained appellant had not even provided a name

---

[5] Appellant concedes his federal constitutional right to a speedy trial is not implicated in this case.

for the deceased individual, appellant's counsel responded, "I know his last name is [Hashemi]. That is as much as I know." Appellant also added, at the hearing, that banking records from the time are no longer available. The trial court denied appellant's motion, concluding "the prejudice is speculative at best and not shown."

We agree with the trial court. Appellant argued that bank records are no longer available, but never made an offer of proof as to what these records, if available, would show. This is insufficient: "[S]peculation about prejudice because potential witnesses' memories have failed or because witnesses and evidence are now unavailable is insufficient to discharge [a] defendant's burden. [Citation.] A particular factual context must be established in which a specific claim of prejudice can be evaluated." (*Shleffar v. Superior Court* (1986) 178 Cal.App.3d 937, 946.)[6]

Appellant's assertion of the unavailability of exculpatory witnesses is similarly insufficient. Appellant conclusorily asserts the existence of former employees of Security Pacific National Bank who would have "covered" his checks, but fails to provide their names or job titles, any efforts to locate them, or any offer of proof as to what their testimony would have been. Similarly, appellant provided no evidence that Hashemi ever existed (including any witnesses, other than appellant, who could attest to his existence or their relationship), nor did he describe efforts to find any such evidence. This showing of prejudice is insufficient. (*Crockett v. Superior Court* (1975) 14 Cal.3d 433, 441 [prejudice not established where the defendant claimed he was unable to locate alibi witnesses but "failed to state any particular facts which permit a determination that such witnesses even exist"]; *People v. Reeder* (1984) 152 Cal.App.3d 900, 910 [prejudice not established where defense counsel stated possibly exculpatory witnesses were unavailable but "failed to state who had so informed him, or what efforts had been made to determine whether such witnesses were available"]; accord, *Blake v. Superior Court*

---

[6] While appellant argues on appeal that documents showing his travel to and from Iran are no longer available, no evidence or proffer of such evidence was before the trial court at the time of the speedy trial hearing.

9

(1980) 108 Cal.App.3d 244, 250-251.)[7]  In light of our conclusion that appellant failed to demonstrate actual prejudice, we need not determine whether the delay was justified.

Finally, appellant argues his trial counsel was ineffective for failing to make a second speedy trial motion after the close of evidence.  Appellant has failed to establish prejudice from any deficient performance in this regard.  Additional evidence of prejudice was established solely through appellant's testimony, which the trial court specifically discredited.  Appellant has not shown a reasonable probability of a different outcome had his trial counsel filed a post-trial speedy trial motion.  (*Thomas, supra,* 37 Cal.4th at p. 1256.)

IV.  *Sentence*

A.  *Section 654*

At sentencing, the trial court sentenced appellant on four of the twenty-six counts and stayed the rest pursuant to section 654, agreeing with the prosecutor's sentencing memorandum that appellant "pass[ed] several bad checks over a period of four days" and thereby warranted sentencing for one check passed on each day.  Appellant challenges this ruling.

Section 654 "preclude[s] multiple punishment where multiple acts, or offenses, were committed incident to a single intent and objective."  (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935 (*Gaio*).)  " '[A] course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]'  [Citation.]  This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public

---

[7] Appellant's citation to federal authority on prejudice resulting from delay is unavailing. Under the federal Constitution, "delay that is 'uncommonly long' triggers a presumption of prejudice"; in contrast, "[u]nder the *state* Constitution's speedy trial right, . . . no presumption of prejudice arises from delay after the filing of a complaint and before arrest or formal accusation by indictment or information [citation]; rather, in this situation a defendant seeking dismissal must affirmatively demonstrate prejudice."  (*People v. Martinez* (2000) 22 Cal.4th 750, 755.)

security or policy already undertaken." (*Ibid.*) "This rule has been applied in numerous instances when several crimes could broadly be described as part of an overarching criminal plan, but were committed on different days." (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1289.) "The defendant's intent and objective present factual questions for the trial court, and its findings will be upheld if supported by substantial evidence." (*People v. Andra* (2007) 156 Cal.App.4th 638, 640 (*Andra*).)

As an initial matter, appellant contends his crimes were committed on the days he deposited the checks with Bank of America; the People argue the crime was complete when appellant filled out the checks. We need not decide this issue because, as the People note, the evidence supports a finding that the checks were deposited on four separate days. Roth testified that one of the stamps on the back of the check in People's Exhibit 1 indicated the check was deposited on March 20. Only one stamp dated March 20, 1984, is found on the back of that check. The same stamp is visible on the other 25 checks; while the date on some is illegible, the legible stamps show that the checks were deposited on at least four consecutive days. Accordingly, regardless of whether the crime was complete when appellant filled out the checks or deposited them, the crimes took place on four days.

The single day separating appellant's crimes is shorter than the time interval in some cases. (E.g., *Andra, supra,* 156 Cal.App.4th at pp. 641-642 [crimes committed weeks apart]; *Gaio, supra,* 81 Cal.App.4th at p. 935 [crimes committed months apart].) Nonetheless, a single day is sufficient time for a trial court to find a defendant renewed his intent on each day. The fact that some prosecutors may have concluded similar schemes encompassed a single intent and thereby charged them as a single crime (see *People v. Conners* (2008) 168 Cal.App.4th 443, 446), does not preclude the trial court from reaching a contrary conclusion here. Similarly, appellant's citation to evidence at trial that could support an inference of a single intent does not bear on whether evidence to the contrary also was present. We conclude substantial evidence supports the trial court's finding that appellant had the opportunity to renew his intent on each separate day he wrote or deposited checks.

11

B. *Victim Restitution*

Saberi and Allen submitted written statements of their losses which were attached to the probation report. Saberi claimed a loss of $45,000 from "kited checks that I had to pay as guarantor," explaining, "I got a call from our bank that our account was overdrawn $45,000." Allen claimed that, in 1988, Bank of America sued him for $232,000; the parties eventually settled for $36,000; in 1989, Allen borrowed the funds to pay Bank of America; and he subsequently had to sell his house to pay off the loan. In addition to the $36,000 payment to Bank of America, he incurred losses retaining an attorney to represent him in the lawsuit, paying interest on the loan, and realtor fees in connection with the sale of his house. Allen also claimed appellant "left a bad debt with Shell Oil Company in the amount of approximately $8,000. Since my name was on the lease, Shell Oil held me responsible. I settled the debt with Shell Oil for approximately $4,000." The trial court ordered appellant to pay restitution for all of the above losses: $45,000 to Saberi and $55,300 to Allen, plus ten percent interest accruing from 1984.

1. *Appellant did not forfeit his challenges to the restitution order*

On appeal, appellant argues (1) the order included restitution for losses not related to the crimes of which appellant was convicted, and (2) the order of interest from 1984 is not authorized because it orders interest to accrue prior to the date of the loss. The People contend appellant forfeited these challenges by failing to object to the restitution order below. We disagree, because appellant challenges the trial court's authority to impose the sentence. " '[T]he "unauthorized sentence" concept constitutes a narrow exception to the general requirement that only those claims properly raised and preserved by the parties are reviewable on appeal.' " (*People v. Anderson* (2010) 50 Cal.4th 19, 26 (*Anderson*) [claim that victim restitution order was unauthorized was not forfeited by failure to object below]; accord, *People v. Percelle* (2005) 126 Cal.App.4th 164, 179 (*Percelle*).)

2. *Section 1202.4 limits the scope of the allowable victim restitution*

Appellant first argues the losses were not caused by the crimes he was convicted of. The scope of the trial court's authority with respect to victim restitution depends on

whether the restitution is ordered pursuant to section 1202.4 or as a condition of probation pursuant to section 1203.1. "[U]nder section 1203.1, 'California courts have long interpreted the trial courts' discretion to encompass the ordering of restitution as a condition of probation even when the loss was not necessarily caused by the criminal conduct underlying the conviction.' " (*Anderson, supra,* 50 Cal.4th at p. 27.) In contrast, section 1202.4 provides: "It is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant *convicted of that crime*." (§ 1202.4, subd. (a)(1), italics added.) Accordingly, "when a court imposes a prison sentence following trial, section 1202.4 limits the scope of victim restitution to losses caused by the criminal conduct for which the defendant sustained the conviction." (*People v. Woods* (2008) 161 Cal.App.4th 1045, 1050 (*Woods*).) As our Supreme Court has explained: "When section 1202.4 imposes its mandatory requirements in favor of a victim's right to restitution, the statute is explicit and narrow. When section 1203.1 provides the court with discretion to achieve a defendant's reformation, its ambit is necessarily broader, allowing a sentencing court the flexibility to encourage a defendant's reformation as the circumstances of his or her case require." (*Anderson, supra,* 50 Cal.4th at p. 29.)

Appellant was sentenced to neither state prison nor probation. We are therefore faced with an issue of first impression: when a defendant is sentenced to county jail followed by mandatory supervision (known as a "split sentence"), is a victim restitution order issued pursuant to section 1202.4 or is it akin to a probation condition? (See Couzens et al., Sentencing Cal. Crimes (The Rutter Group 2013) § 11:31, p. 11-44 ["It is not clear from the realignment legislation that a sentence to county jail under [section 1170(h)], will be the equivalent of a state prison sentence for the purpose of victim restitution under section 1202.4."].) In response to our request for supplemental briefing on this issue, the parties split along predictable lines.

" 'Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in

13

isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' " (*People v. Fandinola* (2013) 221 Cal.App.4th 1415, 1421-1422 (*Fandinola*).)

We look first to the statutory language.  Section 1170(h) provides that during the mandatory supervision period, "the defendant shall be supervised by the county probation officer in accordance with the terms, *conditions*, and procedures generally applicable to persons placed on probation."[8]  (§ 1170(h)(5)(B), italics added.)  This language suggests that victim restitution ordered as a condition of probation can also be ordered as a condition of mandatory supervision.

However, other statutory provisions distinguish mandatory supervision from probation.  Section 1170(h) provides that courts retain the separate authority to grant probation: "Nothing in this subdivision [§ 1170(h)] shall be construed to prevent *other* dispositions authorized by law, including . . . an order granting probation pursuant to Section 1203.1."  (§ 1170(h)(4), italics added.)  Moreover, the Legislature expressly

_____

[8] In its entirety, section 1170(h)(5)(B) currently provides: "The portion of a defendant's sentenced term that is suspended pursuant to this paragraph shall be known as mandatory supervision, and shall begin upon release from custody.  During the period of mandatory supervision, the defendant shall be supervised by the county probation officer in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation, for the remaining unserved portion of the sentence imposed by the court.  The period of supervision shall be mandatory, and may not be earlier terminated except by court order.  Any proceeding to revoke or modify mandatory supervision under this subparagraph shall be conducted pursuant to either subdivisions (a) and (b) of Section 1203.2 or Section 1203.3.  During the period when the defendant is under such supervision, unless in actual custody related to the sentence imposed by the court, the defendant shall be entitled to only actual time credit against the term of imprisonment imposed by the court.  Any time period which is suspended because a person has absconded shall not be credited toward the period of supervision."

14

provided the prior prison sentence enhancement applies when the prior sentence was a split sentence under section 1170(h). (§ 667.5, subd. (b) ["A term imposed under the provisions of paragraph (5) of subdivision (h) of Section 1170, wherein a portion of the term is suspended by the court to allow mandatory supervision, shall qualify . . . for the purposes of the one-year enhancement."].)[9] Courts and commentators, after considering these statutory distinctions between mandatory supervision and probation, have concluded "the Legislature has decided a county jail commitment followed by mandatory supervision imposed under [section 1170(h)] is akin to a state prison commitment; it is not a grant of probation or a conditional sentence." (*Fandinola, supra,* 221 Cal.App.4th at p. 1422; accord, *People v. Martinez* (2014) 226 Cal.App.4th 759, 763; Couzens et al., Sentencing Cal. Crimes, *supra*, § 11-9, p. 11-10 ["the commitment under [section 1170(h)] generally is the equivalent of a prison sentence"].)

This understanding is further supported by legislative history. An earlier version of section 1170(h) provided a sentence under that subdivision may include "a period of county jail time and a period of *mandatory probation* not to exceed the maximum possible sentence." (Stats. 2011, ch. 39, § 27, italics added.) Prior to this version's effective date, the statute was amended to omit the phrase "mandatory probation" and instead clarify the trial court's authority, when sentencing defendants under section

_____

[9] In its entirety, section 667.5, subdivision (b) provides: "Except where subdivision (a) applies, where the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended for any felony; provided that no additional term shall be imposed under this subdivision for any prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended prior to a period of five years in which the defendant remained free of both the commission of an offense which results in a felony conviction, and prison custody or the imposition of a term of jail custody imposed under subdivision (h) of Section 1170 or any felony sentence that is not suspended. A term imposed under the provisions of paragraph (5) of subdivision (h) of Section 1170, wherein a portion of the term is suspended by the court to allow mandatory supervision, shall qualify as a prior county jail term for the purposes of the one-year enhancement."

15

1170(h), to "suspend execution of a concluding portion of the term selected in the court's discretion, during which time the defendant shall be supervised by the county probation officer in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation, for the remaining unserved portion of the sentence imposed by the court." (Stats. 2011-2012, 1st Ex. Sess., ch. 12, § 12.) A subsequent amendment further clarified that "[t]he portion of a defendant's sentenced term during which time he or she is supervised by the county probation officer pursuant to this subparagraph shall be known as mandatory supervision." (Stats. 2012, ch. 43, § 27; see also *id.*, § 14 [adding § 19.9, defining "mandatory supervision" for purposes of the Penal Code].) We agree with the conclusion of another Court of Appeal that "[t]he change in the reference to the latter portion of a defendant's sentence—from probation to supervision by a probation officer—suggests that the Legislature did not intend probation and mandatory supervision to be interchangeable or otherwise identical in all respects." (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 766 (*Ghebretensae*).)

Certain statutes enacted following passage of section 1170(h)(5)(B) suggest that the Legislature has not considered that provision to mean *all* terms, conditions, and procedures of probation apply to mandatory supervision. Specifically, following the enactment of the provision in section 1170(h)(5)(B), the Legislature amended statutes governing certain existing "terms, conditions, and procedures" of probation to expressly extend their application to mandatory supervision. For example, the Legislature amended the statute governing probation revocation to provide that its procedures also apply to mandatory supervision. (§ 1203.2; Stats. 2012, ch. 43, § 30.) The Legislative Counsel's Digest for the amending bill notes: "Under existing law . . . [a defendant sentenced to a split sentence] shall be supervised by the county probation officer in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation. Existing law provides for the revocation of probation, as specified." (Legis. Counsel's Dig., Sen. Bill No. 1023 (2011-2012 Reg. Sess.).) Instead of concluding that the procedures governing revocation of probation therefore govern revocation of mandatory supervision and that any amendment would simply clarify existing law, the Legislative

16

Counsel's Digest states, "The bill would require the revocation or modification of mandatory supervision to be made pursuant to provisions of existing law providing for the revocation of probation." (*Id.*) The Legislature similarly amended the following statutes governing the terms, conditions, and procedures of probation, to extend their application to mandatory supervision: the authority and procedure for trial courts to modify terms and conditions of probation (§ 1203.3; Stats. 2012, ch. 43, § 31); the authority and procedure to transfer probation cases to the probationer's county of residence (§ 1203.9; Stats. 2012, ch. 43, § 32; see *Fandinola, supra,* 221 Cal.App.4th at p. 1423); and a provision that a probationers' refusal to submit to any statutorily required HIV or hepatitis testing constitutes a violation of probation (§ 7519, subd. (b); Stats. 2012, ch. 43, § 58).[10]

Moreover, the Legislature did not amend *all* statutes governing terms, conditions, and procedures of probation to extend their application to mandatory supervision, including, notably, provisions involving restitution. In enacting a revocation restitution fine for persons on mandatory supervision, the Legislature amended the statute providing for *parole* revocation restitution fines, not the one for probation revocation restitution fines. (*Fandinola, supra,* 221 Cal.App.4th at pp. 1422-1423.) In addition, while amending portions of the statutory provision governing the modification of probation terms and conditions to extend their application to mandatory supervision, the Legislature did not so extend a portion governing victim restitution, leaving that provision applicable solely to probation: "Nothing in this section shall be construed to prohibit the court from modifying the dollar amount of a restitution order pursuant to subdivision (f) of Section 1202.4 [setting forth procedures for determining amount of victim restitution] at any time during the term of the probation." (§ 1203.3, subd. (b)(5); see Stats. 2012, ch. 43, § 31.) The Legislature's decision to not amend this provision provides support for a conclusion

---

[10] The bill enacting these changes also added, for the first time, the term "mandatory supervision." (Stats. 2012, ch. 43, §§ 27, 28.)

17

that it did not intend victim restitution ordered as a condition of mandatory supervision to be identical in all respects to restitution ordered as a condition of probation.

Finally, we turn to the rationale behind the rule authorizing broader victim restitution for probation sentences. "With respect to restitution, the distinction between probation and imprisonment in state prison is not an arbitrary one. '[I]t is well settled that a court may impose a victim restitution order as a condition of probation regardless of whether or not the defendant has been convicted of the underlying crime. But this rule flows from the notion "that the granting of probation is not a right but a privilege, and that if the defendant feels that the terms of probation are harsher than the sentence for the substantive offense he is free to refuse probation." ' " (*Woods, supra,* 161 Cal.App.4th at p. 1052.)

The People contend this rationale supports their position because a defendant can similarly refuse mandatory supervision, but they cite no authority for this proposition. The plain statutory language provides otherwise. The supervision is called "*mandatory supervision*"; the Legislature underscored this aspect by adding, "[t]he period of supervision shall be *mandatory*." (§ 1170(h)(5)(B), italics added.) A recent legislative enactment supports this construction. Under current law, for persons sentenced on or after January 1, 2015, a sentence under section 1170(h) "shall" provide for a concluding portion to be mandatory supervision unless the court finds it not appropriate in a particular case in light of "the interests of justice." (§ 1170(h)(5)(A), (h)(7); Stats. 2014, ch. 26, § 16.) This provision indicates a legislative preference for split sentences under section 1170(h) and leaves it to the court—not the defendant—to decide whether such a sentence is inappropriate in a given case. Commentators have concluded that a defendant cannot refuse mandatory supervision. (Couzens & Bigelow, Felony Sentencing After Realignment (Mar. 4, 2014) <http://www.courts.ca.gov/partners/documents/felony_sente ncing.pdf> [as of Dec. 3, 2014], p. 35 ["Supervision under a 'split' or 'blended' sentence under section 1170(h)(5)(B), unlike probation, is mandatory; the defendant may not legally refuse the supervision."]; Levenson, Cal. Criminal Procedure (The Rutter Group 2013) § 25:80 ["If a split sentence is imposed, the defendant may not refuse mandatory

supervision."].)  We agree.  "Mandatory" means that if the court orders a split sentence, the defendant has no option to decline supervision.  Neither law nor logic supports the contrary interpretation proposed by the People.  Since a defendant has no right to refuse a sentence including mandatory supervision, the rationale underlying the rule authorizing broader victim restitution in probation sentences—" ' "that if the defendant feels that the terms of probation are harsher than the sentence for the substantive offense he is free to refuse probation" ' " (*Woods, supra,* 161 Cal.App.4th at p. 1052)—does not apply.

Absent this rationale, and in light of statutory language and history that is at best ambiguous on this issue, we see no basis to impose as a condition of mandatory supervision victim restitution broader than that allowed by section 1202.4.  This conclusion need not render the language in section 1170(h)(5)(B) superfluous or a nullity. There are effectively two sets of "terms, conditions, and procedures" governing probationers and persons on mandatory supervision: those imposed by the trial court under the authority of state law, and those imposed by the individual county probation officers.  With respect to the former, the Legislature, as discussed above, has enacted specific statutes for persons on mandatory supervision, some of which are the same as those for probationers and some of which are different.  With respect to the latter category—the terms, conditions, and procedures implemented by the individual county probation departments for handling persons under their supervision—section 1170(h)(5)(B) advises that these should be generally the same for probationers and persons on mandatory supervision.  Indeed, the language focuses on the county probation officer's supervision, not the trial court's authority: "the defendant shall be *supervised by the county probation officer* in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation . . . ."  (§ 1170(h)(5)(B), italics added; see *Ghebretensae, supra,* 222 Cal.App.4th at p. 764 [the relevant language "pertains to the *nature and manner of supervision by the probation officer over the defendant*—in other words, the nature and manner of the supervision itself"].)  Construed in this manner, the language in section 1170(h)(5)(B) is consistent with our conclusion

that the broad scope of victim restitution which can be imposed by the trial court as a condition of probation cannot be imposed as a condition of mandatory supervision.

Accordingly, we conclude victim restitution ordered as part of a sentence to county jail followed by mandatory supervision pursuant to section 1170(h) is an order pursuant to section 1202.4 and its scope is limited "to those losses arising out of the criminal activity that formed the basis of the conviction." (*Woods, supra,* 161 Cal.App.4th at p. 1049.)

3. *Portions of the restitution order are not valid under section 1202.4*

We have little difficulty concluding the losses claimed by Allen in connection with the BOA account arose out of appellant's convictions. Appellant argues he was acquitted of grand theft and therefore cannot be ordered to pay restitution for these losses. But his acquittal on this count does not preclude a restitution order if the losses arose from the counts on which appellant was convicted. The causation inquiry is derived from tort principles and asks whether the defendant's conduct was a proximate cause or "substantial factor" in the loss. (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1321-1322.) Moreover, "[t]he standard of proof at a restitution hearing is preponderance of the evidence, not reasonable doubt." (*Id.* at p. 1319.) There was evidence that, shortly after appellant deposited the checks and fled, Allen was held liable for a deficit in their joint BOA account approximately equivalent to the amount of appellant's checks. This is sufficient to allow the court to conclude appellant's insufficient checks were a substantial factor in Allen's losses in connection with the BOA account.[11]

---

[11] Appellant also appears to contend the order of restitution for Allen's losses in connection with the BOA account lacked substantial evidence because Allen failed to submit any supporting documents verifying the claimed amounts. We need not decide whether this contention was forfeited by his failure to object below because, in either event, it is without merit. Allen submitted a written, itemized claim of his losses; the probation report included this claim and recommended restitution be ordered for these losses. "[S]tatements by the victims of the crimes about the value of the property stolen constitute 'prima facie evidence of value for purposes of restitution.' . . . 'When the probation report includes information on the amount of the victim's loss and a recommendation as to the amount of restitution, the defendant must come forward with

We cannot reach the same conclusion with respect to the remainder of the award. Saberi claimed $45,000 in losses from overdrafts on the account he held with appellant. That account was the SPNB account. None of the checks appellant wrote on the SPNB account which were the basis of his convictions were honored. While appellant may have conducted a similar scheme in connection with the SPNB account, any such conduct was not the basis for his convictions. Similarly, Allen claimed appellant left him with a $4,000 debt to Shell Oil Company. The People argue but for appellant's check kiting scheme, the funds to pay the Shell Oil debt would have remained in the BOA account. We are not persuaded by this argument, as Allen has already sought restitution based on his liability for the amount of the checks deposited by appellant. Again, appellant may have fraudulently withdrawn additional funds from the BOA account, but such conduct was not the basis for his convictions. Accordingly, we will strike the restitution ordered for these losses.

4. *The award of interest must be recalculated*

Appellant next challenges the award of interest dating from 1984. We agree this award is not authorized by law, which permits only interest "that accrues as of the date of sentencing or loss, as determined by the court." (§ 1202.4, subd. (f)(3)(G).) While the trial court determined the interest should accrue from the date of the loss, Allen's itemized statement of his BOA account losses show the majority of the losses occurred at varying dates after 1984. We will remand to the trial court to determine, or to direct the probation department to determine, the amount of interest accruing on Allen's BOA account losses from the date each loss occurred.

C. *Mandatory Supervision Terms*

Appellant challenges several of the terms of his mandatory supervision. "We . . . analyze the validity of the terms of [mandatory supervision] under standards . . . parallel

contrary information to challenge that amount.' [Citation.] Absent a challenge by the defendant, an award of the amount specified in the probation report is not an abuse of discretion." (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1048.) Appellant made no such challenge.

to those applied to terms of parole." (*Martinez, supra,* 226 Cal.App.4th at p. 763.) "[T]he courts are given broad discretion in fashioning terms of supervised release, in order to foster the reformation and rehabilitation of the offender, while protecting public safety." (*Id.* at p. 764.) " 'A condition of [parole] will not be held invalid unless it "(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality. . . ." ' " (*Ibid.*)

As an initial matter, the People argue appellant forfeited these claims by failing to object to the terms below. "It is settled that failure to object and make an offer of proof at the sentencing hearing concerning alleged errors or omissions in the probation report waives the claim on appeal. [Citations.] No different rule should generally apply to probation conditions under consideration at the same time. A timely objection allows the court to modify or delete an allegedly unreasonable condition or to explain why it is necessary in the particular case. . . . A rule foreclosing appellate review of claims not timely raised in this manner helps discourage the imposition of invalid probation conditions and reduce the number of costly appeals brought on that basis." (*People v. Welch* (1993) 5 Cal.4th 228, 234-235, fn. omitted.) We conclude this rule and its underlying rationale apply equally to conditions of mandatory supervision.

All but one of the terms challenged by appellant were included in the probation report. Not included in the probation report—or mentioned by the trial court prior to imposition of sentence—is the condition directing appellant to refrain from alcohol use. We conclude appellant's challenge to this condition is not forfeited because appellant had no meaningful opportunity to object before it was imposed. (*People v. Scott* (1994) 9 Cal.4th 331, 356 [no waiver of discretionary sentencing decisions absent "a meaningful opportunity to object," i.e., "if, during the course of the sentencing hearing itself and before objections are made, the parties are clearly apprised of the sentence the court intends to impose and the reasons that support any discretionary choices"].) Moreover, we agree with appellant that this term should be stricken. The consumption of alcohol is not in itself criminal, nor is it reasonably related to the appellant's crimes or future

22

criminality: the probation report states appellant does not currently use alcohol and gives no indication that appellant has a history of substance abuse or that alcohol use was connected to appellant's crimes.

The remainder of appellant's claims were forfeited; however, appellant contends his trial counsel's failure to object to the terms constituted ineffective assistance of counsel. With one exception, we reject these claims. Appellant first challenges the imposition of victim restitution as a condition of mandatory supervision without regard to his ability to pay. However, section 1202.4, subdivision (g), precludes consideration of a defendant's "inability to pay" in determining the amount of a restitution order. Appellant relies on section 1203.2, subdivision (a), which governs revocation of supervision and provides: "Supervision shall not be revoked for failure of a person to make restitution imposed as a condition of supervision unless the court determines that the defendant has willfully failed to pay and has the ability to pay. Restitution shall be consistent with a person's ability to pay." We disagree with appellant's contention that the latter sentence governs the initial imposition of restitution and therefore irreconcilably conflicts with section 1202.4, subdivision (g). Instead, reading that sentence in connection with the immediately preceding one, we conclude it is implicated only in the event of revocation proceedings. (See *Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 419-420 [where two statutes are in apparent conflict such that the later-enacted could be read to impliedly repeal the earlier-enacted, "[t]he courts are bound, if possible, to maintain the integrity of both statutes if the two may stand together" such that "[t]here must be '*no possibility* of concurrent operation' "].) Accordingly, at the time of sentencing, the trial court was not obligated to consider appellant's ability to pay.

Appellant next challenges the condition that he maintain employment and/or educational or vocational training. Appellant argues the probation report identified a number of health issues demonstrating appellant will be unable to comply with this condition. The probation report does document various illnesses. A different finder of fact might conclude appellant is unable to participate in employment or

23

educational/vocational training as a result. However, on this record, we are not persuaded the trial court's contrary conclusion is an abuse of discretion, and therefore appellant has failed to demonstrate prejudice from any deficiency in his trial counsel's failure to object to this term.

Appellant challenges a term that he submit to random testing for controlled substances. The probation report states appellant "tried cocaine on a couple occasions 'many years ago,' and recently tried marijuana once but did not like the effects." Although this evidence of substance use is minor, it shows appellant is willing to try controlled substances. The trial court's conclusion such use could be reasonably related to future criminality and consequent imposition of the term is not an abuse of discretion.

Appellant challenges the prohibition on his possession of deadly or dangerous weapons other than firearms.[12] The People concede this term should be stricken. We agree, as there is no evidence of any connection between such weapons and appellant's crimes or future criminality.

Finally, appellant challenges the term requiring him to submit to warrantless searches. He contends the condition is not warranted in this case because he has no apparent criminal record for the years since his commission of the crimes at issue here. We are not persuaded that, because of the passage of time alone, this term is an abuse of discretion.

---

[12] Appellant does not challenge the portion of this condition prohibiting his possession of firearms, as he concedes he is already prohibited from such possession by virtue of his felony convictions. (§ 29800, subd. (a)(1).)

24

DISPOSITION

The judgment is reversed and remanded for proceedings consistent with this opinion.

_____
SIMONS, J.

We concur.

_____
JONES, P.J.

_____
BRUINIERS, J.

Superior Court of San Mateo County, No. SC077313A, Hon. Craig Parsons, Judge.

Amos Lawrence, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Eric D. Share and Luke Fadem, Deputy Attorneys General, for Plaintiff and Respondent.