Filed 8/11/21  P. v. Breshears CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Trinity)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>SETH THOMAS BRESHEARS,<br><br>        Defendant and Appellant. | C092078<br><br>(Super. Ct. No. 19F014A) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>RYAN DAYMON FORTNER,<br><br>        Defendant and Appellant. | C092079<br><br>(Super. Ct. No. 19F014C) |

A jury found defendants Seth Thomas Breshears and Ryan Daymon Fortner guilty of five counts of second degree burglary (counts one, two, three, five, and six).  Each

count pertained to a separate structure on the Department of Fish and Wildlife (DFW) compound in Lewiston: the warden's garage, the fisheries shop, the fisheries mobile home, and two trailers. The jury found both defendants not guilty of burglary as to a third trailer (count four). The jury also found Breshears not guilty of possession of a firearm by a person who has previously been convicted of a felony (count seven) and Fortner not guilty of causing a firearm to be carried concealed within a vehicle (count eight).

The trial court denied probation and sentenced defendants to an aggregate split term of five years and eight months: two years and eight months in county jail and three years on mandatory supervision.

On our own motion, we consolidated Fortner's and Breshears's appeals for purposes of oral argument and decision. A third defendant, Angela Michelle Latten, was convicted of the same offenses and received the same sentence. We upheld her conviction in a separate appeal. (*People v. Latten* (Apr. 23, 2021, C091889 [nonpub. opn.].)

Latten raised none of the issues presented by her co-defendants. Fortner and Breshears each argue: (1) their trial counsels rendered ineffective assistance by failing to object to the prosecutor's closing argument; (2) the trial court erred in failing to instruct the jury with CALCRIM No. 224 on how to consider circumstantial evidence introduced to prove an issue other than intent or mental state; (3) the cumulative effect of this ineffective assistance of counsel and instructional error requires reversal; and (4) a 10 percent administrative fee on the victim restitution ordered by the court should be stricken. Breshears also argues remand is required to determine his ability to pay other fees. We conclude neither the cumulative effect nor the individual effect of the alleged ineffective assistance of counsel or the trial court's decision not to instruct the jury with CALCRIM No. 224 necessitates reversal. We accept the People's concession that the 10 percent administrative fees must be stricken. We also direct the trial court to correct a

clerical error in Breshears's abstract of judgment.  In all other respects, we affirm the judgments as to Fortner and Breshears.

## I.  BACKGROUND

On February 7, 2019, L. and B. lived overlooking the DFW buildings on Cemetery Road in Lewiston.  At around 9:30 p.m., L. saw a dark vehicle pull up to the buildings.  The vehicle was about 30 yards away.  Three vehicle doors opened, and three figures walked toward the largest building.  After five to eight minutes, L. heard a grinder turn on and what sounded like chains being rattled.

L. saw the door open to the largest building and a smaller office building.  He also saw the light go on in the smaller building.  L. saw lights in the open trunk of the vehicle as well, and he heard big metal objects being moved.

B. heard people talking and what sounded like something grinding a chain in half coming from the DFW area.  She went inside and called the sheriff.  It was about 9:30 p.m.  After the person she spoke to called back, B. gave the phone to L.

At about 9:33 p.m., Trinity County Sheriff's Deputy Ruiz was dispatched to the DFW compound on Cemetery Road due to a report of a suspicious looking dark sedan and grinder noises.  It took Deputy Ruiz 10 to 15 minutes to get there.  While he was on his way, dispatch told him the sedan had left the premises.

As Deputy Ruiz approached Cemetery Road, he saw what looked like a dark sedan several hundred yards from the entrance to the DFW compound.

Deputy Ruiz stopped the sedan, and the driver identified himself as Fortner.  Latten was in the passenger seat and Breshears was sitting in the back seat behind her.  Fortner and Latten had marijuana residue on their clothing.  Latten explained they were coming from Redding and had been trimming marijuana.  Fortner said he had been picked up at the Plug and Jug about 15 minutes earlier.  Deputy Ruiz remarked that it did

3

not take that long to get there from the Plug and Jug, and Fortner said he had stopped by the bridge to smoke.[1]

Other officers arrived, including DFW Officer Smith. Officer Smith testified that the chain that crosses the entryway to the facility was down and the padlock that had connected it appeared to have been ground. When he had last left the compound about a week earlier, all of the doors of the buildings had been closed and the trailers had been locked.

Among the items found in the sedan were marijuana residue, Muck boots, a battery-operated grinder, a black toolbox with orange handles, a come-along, tie-downs, a set of keys, a manila envelope, a camouflage motor cycle helmet, a backpack, a drill, an air compressor, a battery, an evidence tag, and two cans of blackberry flavored Sparks—one on the passenger-side floorboard and one in the pocket on the back of the driver's seat. The keys were turned over to Officer Smith because he believed they were from one of the DFW buildings. The battery and helmet were also returned to Officer Smith. The helmet was his. He identified the battery as belonging to the ATV that was kept in one of the DFW buildings. The battery had been inside the backpack along with a .45 caliber firearm. Breshears told law enforcement that he had found the firearm.

Photographs of the bottom of Fortner's, Breshears's, and Latten's shoes were taken and compared to photographs of shoe prints from the crime scene. Deputy Ruiz opined that Breshears's shoes "had striking similarities" to one of the shoe prints from the scene, and Latten's appeared to have the same hexagon-shaped pattern as a different set of shoe prints from the scene.

---

[1] Deputy Ruiz testified that the Plug and Jug was only a couple of minutes way.

DFW Officer Smith and a second sheriff's deputy searched all of the DFW buildings. The next day, Officer Smith and fellow DFW Officer Cardoza reinspected each of the buildings defendants were ultimately convicted of burglarizing.

When Officer Smith first inspected the warden's garage (count one) on the evening of February 7, 2019, the door was ajar, and a light was on inside. There was an ATV in the garage, but the helmet and battery for the ATV were missing. DFW Officer Cardoza testified the garage looked like it had been ransacked.

The door to the fisheries shop (count two), which held tools, was wide open. Some of the cabinets were open. Officer Cardoza believed the cable come-along that was in the sedan came from the fisheries shop. A supervisor for the fisheries shop testified that the cordless drill and grinder found in the sedan looked similar to items that were used in the shop.

The door to the fisheries mobile home (count three) was wide open, and a window was also open. Below the window were fresh footprints.

Trailer number one (count four) is an empty trailer. It was still locked, but it appeared as if someone had tried to force his or her way into it. The back door was open wide enough for someone to stick their head inside.

The door to trailer number two (count five), which held marijuana-related evidence, was open. The cable lock that had been used to secure the door had been cut and was on the ground. Marijuana from a tub was strewn around the inside of the trailer. A can of blackberry Sparks was on the ground, open, mostly full, and still cold. DFW Officer Cardoza testified that the evidence tag that was found in the sedan had his handwriting on it and was from a marijuana sample that had been locked in trailer number two. Likewise, the manila envelope had stored marijuana from an earlier case and had been locked in trailer number two. According to Officer Cardoza, the marijuana found in the back of the sedan was consistent with the marijuana in trailer number two, which was old, dry, and brittle.

5

Trailer number three (count six) was another evidence trailer. The padlock that had secured the door had been cut, and the door was open. The door appeared to have been pried open. Trailer number three contained evidence of butane honey oil lab equipment. Officer Cardoza testified that he believed the tie-downs that were found in the sedan were taken from trailer number three because they were similar to what holds in place the butane and propane tanks. There was a black bag outside of trailer number three that had been inside the trailer the week before.

Officer Cardoza opined that the toolbox that was in the sedan had come from the fisheries shop (count two) or trailer number three (count six). He also opined the Muck boots were taken from one of the DFW buildings based on their consistency with the Muck boots he had seen in them.

Latten's friend Jessica testified as part of her defense. Jessica said that on the evening of February 7, 2019, she was in a subdivision off the main road in Lewiston with Latten trimming marijuana. Latten left after getting into the front passenger seat of a dark blue sedan at about 9:45 p.m.

Latten also testified that she was at a house in the Lewiston subdivision until 9:45 p.m. on February 7, 2019, when she got into the sedan driven by Fortner. She frequently let Fortner borrow her car. Breshears was in the back seat. They drove past the Plug and Jug and pulled over near a bridge to smoke. Latten denied picking Fortner up at the Plug and Jug or going to the DFW compound that evening.

Latten denied stealing any items from the DFW compound. She testified that various items found in the sedan, including the air compressor, keys, drill, and grinder were hers. Other items, such as the Muck boots, helmet, and manila envelope were not hers.

Officer Cardoza testified that the Plug and Jug had closed its business before July 2018 and just recently reopened. It was not open for business on February 7, 2019.

## II. DISCUSSION

### A. *Prosecutorial Misconduct*

#### 1. *Closing Argument*

During her closing argument, the prosecutor stated:

"Reasonable doubt is a concept that we use every day. We make decisions every day based on reasonable doubt. Not beyond all doubt, not beyond a shadow of a doubt. We talked about this for a long time on voir dire during jury selection.

"I would submit when you buy a car, you're not convinced beyond all doubt. In addition, you buy it based on reasonable doubt. You deal with things every day in your life because you have no way of making decisions every day, beyond—based on beyond all doubt.

"And when you buy a car, you don't just buy it because you like the steering wheel. You don't just like it—you don't just buy it because you like the tires. You don't just buy it because you like the miles per gallon.

"You look at it as a whole. You look at all of the evidence about that car. You look at all of the facts you know about that car. And then you make the decision as to whether you're convinced beyond a reasonable doubt that this is the car for you.

"So it's a concept we use every day. We don't just look at bits and pieces of things."

#### 2. *Alleged Ineffective Assistance of Counsel*

Fortner and Breshears (hereafter "defendants") contend the prosecutor's closing argument trivialized the reasonable doubt standard, and their trial counsel rendered ineffective assistance by failing to object.

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements

7

[citation].' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).) "The case law is replete with innovative but ill-fated attempts to explain the reasonable doubt standard." (*Id*. at p. 667.)

Defendants' argument targets the prosecution's suggestion that reasonable doubt is a concept that jurors use every day. (See *Centeno, supra*, 60 Cal.4th at p. 672 ["It is certainly proper to urge that the jury consider all [of] the evidence before it"].) *People v. Nguyen* (1995) 40 Cal.App.4th 28 (*Nguyen*), discussed a similar assertion of prosecutorial misconduct. In *Nguyen*, the prosecutor argued:

" 'The standard is reasonable doubt. That is the standard in every single criminal case. And the jails and prisons are full, ladies and gentlemen. [¶] It's a very reachable standard that you use every day in your lives when you make important decisions, decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving. If you have reasonable doubt that you're going to get in a car accident, you don't change lanes.

" 'So it's a standard that you apply in your life. It's a very high standard. And read that instruction, too. I won't paraphrase it because it's a very difficult instruction, but it's not an unattainable standard. It's the standard in every single criminal case.' " (*Nguyen*, *supra*, 40 Cal.App.4th at p. 35.)

The appellate court held that this was misconduct because it "trivialize[d] the reasonable doubt standard." (*Nguyen*, *supra*, 40 Cal.App.4th at p. 36.) The court explained: "It is clear the almost reflexive decision to change lanes while driving is quite different from the reasonable doubt standard in a criminal case. The marriage example is also misleading since the decision to marry is often based on a standard far less than reasonable doubt . . . ." (*Ibid.*) It concluded: "We strongly disapprove of arguments suggesting the reasonable doubt standard is used in daily life to decide such questions as whether to change lanes or marry." (*Ibid.*) Likewise, our Supreme Court long ago stated that "[t]he judgment of a reasonable man in the ordinary affairs of life, however

8

important, is influenced and controlled by the preponderance of the evidence. . . .  But in the decision of a criminal case involving life or liberty, something further is required.  There must be more than a preponderance of evidence.  There must be in the minds of the jury an abiding conviction, to a moral certainty, of the truth of the charge, derived from a comparison and consideration of the evidence.  They must be entirely satisfied of the guilt of the accused." (*People v. Brannon* (1873) 47 Cal. 96, 97.)

Despite the prosecutor's misconduct, we conclude defendants have not demonstrated ineffective assistance of counsel.  This is because their counsels' omissions did not result in prejudice.  To establish ineffective assistance, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694; accord *Centeno*, *supra*, 60 Cal.4th at p. 676.)

It is not reasonably probable the prosecutor's argument caused one or more jurors to convict based on a lesser standard of proof than beyond a reasonable doubt.  (See *Centeno*, *supra*, 60 Cal.4th at p. 677.)  " 'We presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Dalton* (2019) 7 Cal.5th 166, 260.)  The misconduct recognized in *Nguyen* is premised on the notion jurors do not use the reasonable doubt standard in daily life; instead, they use a lesser standard.  The trial court correctly instructed the jury regarding the definition of reasonable doubt with CALCRIM No. 220, including that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true."  The court also instructed the jury that "[i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  "The court also gave the written instructions to 'the jury to consult during deliberations.' " (*Dalton, supra,* at p. 261.)  We presume the jury followed these instructions.

9

Additionally, unlike in *Centeno* and contrary to defendants' argument, the evidence implicating them was strong. (See *Centeno*, *supra*, 60 Cal.4th at p. 677 ["this was a very close case"].) Defendants were stopped in Latten's car shortly after the robbery with items that could have only come from different buildings in the DFW compound. Latten did not explain the possession of all of these items and her testimony, even if it could be believed, did not suggest her co-defendants' innocence. We agree with the People that on this evidence, combined with the instructions given, it is not reasonably likely the jury would have reached a different result had counsel objected and a curative instruction been given. Accordingly, defendants were not prejudiced by their counsels' failure to object to the prosecutor's misconduct.

B.      *CALCRIM No. 224*

Defendants contend the trial court erred in failing to instruct the jury with CALCRIM No. 224 on how to consider circumstantial evidence introduced to prove an issue other than intent or mental state.

An instruction on the principles contained in CALCRIM No. 224 " 'must be given sua sponte when the prosecution substantially relies on circumstantial evidence to prove guilt.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 885.) "[B]ut it should not be given where the evidence relied on is either direct or, if circumstantial, is not equally consistent with a reasonable conclusion of innocence." (*People v. Heishman* (1988) 45 Cal.3d 147, 167 (*Heishman*), abrogated on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.) Additionally, " 'CALCRIM Nos. 224 and 225 provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive. [Citation.]' [Citation.] CALCRIM No. 224 'is the proper instruction to give unless the only element of the offense that rests substantially or entirely on circumstantial evidence is that of specific intent or mental state.' " (*People v. Contreras* (2010) 184 Cal.App.4th 587, 592.) Here, the trial court instructed the jury with CALCRIM No. 225 and not CALCRIM No. 224.

10

The People concede the prosecution relied on circumstantial evidence at least to prove identity, but argue the trial court had no obligation to instruct the jury with CALCRIM No. 224 because the circumstantial evidence was not equally consistent with a reasonable conclusion of innocence. Breshears argues our Supreme Court has "moved away" from this approach because the more recent *Rogers* and *People v. Sandoval* (2015) 62 Cal.4th 394, do not mention this principle and do not cite *Heishman*. We disagree. The majority in neither opinion discusses *Heishman* or the rule articulated therein. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10.) Thus, we remain bound by *Heishman*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Regardless, the reason the instruction is not required where the circumstantial evidence is not equally consistent with a reasonable conclusion of innocence overlaps with the question of prejudice. As such, we will turn to that dispositive question. Where the trial court fails to instruct with CALCRIM No. 224, we must determine whether there is a reasonable probability that a properly instructed jury would have returned a verdict more favorable to defendant. (*People v. Rogers*, *supra*, 39 Cal.4th at pp. 886-887; *People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. Sandoval*, *supra*, 62 Cal.4th at pp. 421-422 [trial court erroneously failed to give instruction on finding special circumstances based on circumstantial evidence].) " ' " ' "[A] 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." ' " ' " (*People v. Sandoval*, *supra*, at p. 422.) "Further, the *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v.*

11

*Beltran* (2013) 56 Cal.4th 935, 956.) Whether or not CALCRIM No. 224 was required, it was not reasonably probable either defendant would have obtained a better result had the instruction been given.

The jury was instructed that to prove a defendant was guilty of burglary, the People had to prove the defendant entered a building or cargo trailer, and that when he or she did so, he or she intended to commit theft. The jury was also instructed on aiding and abetting.

The jury was instructed with CALCRIM No. 223 on the difference between direct and circumstantial evidence and the fact that both may be used to prove or disprove the elements of a charge. Additionally, the jury was instructed with CALCRIM No. 225 that "[t]he People must prove not only that the defendant did the act charged, but also that he or she acted with a particular intent. The instruction for each crime and allegation explains the intent required. [¶] An intent may be proved by circumstantial evidence. [¶] Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant had the required intent, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

Like CALCRIM No. 225, CALCRIM No. 224 states: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has

12

been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt." Additionally, the omitted pattern instruction sets forth the following: "Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

As in *Rogers*, the trial court's decision not to give CALCRIM No. 224 could not have affected the issue of intent, and as to the remaining issues of identity and entry (and the non-intent aspects of aiding and abetting), the circumstantial evidence supporting the jury's determination was strong, and the evidence pointing toward innocence was weak. (See *People v. Rogers, supra*, 39 Cal.4th at p. 886 ["Because CALJIC No. 2.02 was given, the failure to give CALJIC No. 2.01 could have affected only the issue of identity. On that issue, the evidence supporting the jury's determination that defendant killed [the victim], while circumstantial, was strong"].) Again, defendants were found in a vehicle shortly after the robberies and just outside the DFW compound with various items that could have only been explained by their entry into different DFW structures. The circumstantial evidence pointed convincingly to their guilt on the counts on which they were convicted and was not consistent with a reasonable conclusion of their innocence. It may have been reasonable to conclude from the shoe patterns alone that defendants were not present at the crime scene, but that was not a reasonable conclusion to draw from the circumstantial evidence as a whole. Given the timeline of events, we cannot conclude Fortner's statement to the sheriff's deputy that he had been picked up by Latten and Breshears 15 minutes earlier (which was around the time the officer had been dispatched during an ongoing robbery) altered the analysis of the circumstantial evidence.

13

Moreover, the evidence supporting the judgments was so comparatively strong and the other evidence so comparatively weak, it was not reasonably probable the alleged instructional error affected the result. Accordingly, reversal is not warranted.

C. *Cumulative Error*

Defendants argue the cumulative effect of the alleged ineffective assistance of counsel and instructional error requires reversal of their convictions. We have assumed error with respect to the prosecutor's closing argument and the instructions on circumstantial evidence. Even considered together, these errors do not necessitate reversal. (See *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 63.)

D. *Fees and Fines*

1. *Administrative Restitution Collection Fee*

At sentencing, the trial court ordered both defendants to pay victim restitution in the amount of $3,387.65. The court also imposed a 10 percent administrative fee and indicated it was pursuant to Trinity County Ordinance 3.36.020.

On appeal, defendants argue, and the People concede, that the 10 percent administrative fee should be stricken because the referenced county ordinance, and the statute on which it relies, do not apply unless probation has been granted. We accept the People's concession. Trinity County Ordinance 3.36.020(A) provides "when a defendant or defendants are ordered to make restitution to a victim or victims pursuant to . . . [s]ection 1203.1, a fee may be imposed to cover the actual administrative cost of collecting restitution not to exceed ten percent of the total amount ordered to be paid." Section 1203.1, in contrast to section 1202.4, only applies when the court grants probation. (See *People v. Anderson* (2010) 50 Cal.4th 19, 26-29 [comparing sections 1203.1 and 1202.4].) Here, the trial court denied probation and victim restitution was authorized under section 1202.4, subdivision (f). (*People v. Rahbari* (2014) 232 Cal.App.4th 185, 196, disapproved on another ground by *People v. Bryant* (July 29, 2021, S259956) __ Cal.5th __ [2021 Cal. LEXIS 5260, at *12, fn. 5] ["victim restitution

14

ordered as part of a sentence to county jail followed by mandatory supervision pursuant to section 1170[, subdivision ](h) is an order pursuant to section 1202.4"].)  As such, the 10 percent administrative fee was unauthorized and must be stricken.

> ### 2.    *Dueñas*

Breshears challenges the trial court's imposition of a $200 court operations assessment (§ 1465.8) and a $150 court facilities assessment (Gov. Code, § 70373).  Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Breshears argues the trial court violated his right to due process and equal protection by not first conducting a hearing on his ability to pay.  The People respond that Breshears forfeited this argument by failing to object in the trial court.  We agree.[2]

The decision in *Dueñas* was issued more than a year before Breshears's sentencing.  (*Dueñas*, *supra*, 30 Cal.App.5th 1157.)  Breshears's failure to object on the basis of *Dueñas* forfeited this challenge.  (See, e.g., *People v. Avila* (2009) 46 Cal.4th 680, 729 [rejecting argument that defendant was exempted from forfeiture because restitution fine amounted to an unauthorized sentence based upon his inability to pay].)  That Breshears's ability to pay claims are constitutional in character does not alter the application of the forfeiture doctrine.  (See *People v. Trujillo* (2015) 60 Cal.4th 850, 859 [constitutional exception to forfeiture rule did not apply to claim concerning failure to obtain express waiver of an ability to pay hearing]; *In re Sheena K.* (2007) 40 Cal.4th 875, 880-881 [noting longstanding rule that a constitutional right may be forfeited in criminal proceedings " ' "by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it" ' "].)  Nor does his citation to the subsequent *People v. Son* (2020) 49 Cal.App.5th 565, which agreed with *Dueñas* as to the assessments he challenges on appeal, alter our conclusion.  (See *Son*, *supra*, at pp. 577-

---

[2]  We note Breshears does not argue his trial counsel was ineffective in failing to object based on *Dueñas*.

15

578, 581.)  The court in *Son* concluded "*Dueñas* error" is not forfeited if not raised in *pre- Dueñas* proceedings.  (*Son*, *supra*, at p. 597.)  We conclude Breshears has forfeited his claim of *Dueñas* error in a post-*Dueñas* proceeding.

Additionally, Breshears acknowledges his abstract of judgment does not accurately reflect the amount of the assessments orally imposed, and that the oral pronouncement controls.  (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)  We will order Breshears's abstract of judgment corrected.[3]

### III.  DISPOSITION

The 10 percent administrative fees are stricken.  As modified, the judgments are affirmed.  The trial court is directed to correct the abstract of judgment for Breshears to reflect the imposition of a $200 court operations assessment (§ 1465.8) and a $150 court facilities assessment (Gov. Code, § 70373) as set forth in the oral pronouncement, and to forward a certified copy of the abstract of judgment to the Department of Corrections and Rehabilitation.

/S/

_____

RENNER, J.

We concur:

/S/

_____

BLEASE, Acting P. J.

/S/

_____

ROBIE, J.

_____

[3]  Fortner's abstract of judgment requires no correction.